IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
HARRISBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CASE NO. |
| v. | : | 1:26-CR-00098 |
| | : | |
| | : | |
| MATTHEW S. PLEISSE | : | (Judge Mariani) |

TRANSCRIPT OF DIGITALLY-RECORDED PROCEEDINGS
DETENTION HEARING

Held before CHIEF MAGISTRATE JUDGE DARYL F. BLOOM
May 19, 2026, Courtroom Number 4B
Sylvia H. Rambo United States Courthouse, Harrisburg, PA

APPEARANCES:

STEPHEN DUKES, ESQUIRE
United States Attorney's Office
1501 North Sixth Street
Harrisburg, PA 17102
For the United States

BRANDON R. REISH, ESQUIRE
Federal Public Defender's Office
201 Lackawanna Avenue, Suite 317
Scranton, PA 18503
For the Defendant

Proceedings digitally-recorded; transcript produced by computer-aided transcription.

# I N D E X T O W I T N E S S


| FOR THE DEFENDANT | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| John Edward Pleisse | 4 | 12 | 22 | -- |

FOR THE GOVERNMENT

None

*(Digital recording begins.)*

THE COURT: The next matter before the Court is United States of America versus Matthew -- I believe you said Pleisse -- correct?

THE DEFENDANT: Yes. Yes, Your Honor.

THE COURT: -- at this court's docket number 1:26-CR-00098. This matter was initially seen for initial appearance on May 15, 2026; and, at that time, the matter was adjourned until today for a detention hearing.

I'll note that the defendant is present today before the Court with Brandon Reish as counsel and, also, that the government is represented by Mr. Dukes. And I believe this is a presumption case. Mr. Reish, are you prepared to proceed?

MR. REISH: Yeah. Good morning, Your Honor. We had notified probation, and they ran the background, and I believe Your Honor got that, on John Pleisse, who is present in court this morning.

THE COURT: I did, indeed, receive that and the indication from probation was that no criminal history was found.

MR. REISH: Correct. I could proffer some information about him and then could offer him as a third-party custodian as part of an overall presentation as well if Your Honor has any questions for Mr. Pleisse.

THE COURT: Okay. I would, at some point, like him

to take the stand and be subjected to questions to make sure he's available for that capacity and subject to cross examination.

MR. REISH: Thank you, Your Honor.

THE COURT: And I'll let you decide if you want to do that now or you want to do your other presentation first.

MR. REISH: Sure. I'll go ahead and lead with Mr. Pleisse.

***JOHN EDWARD PLEISSE, DEFENDANT'S WITNESS, DULY SWORN***

COURTROOM DEPUTY: Please state your full name for the record, and please spell your last name.

THE WITNESS: My name is John Edward Pleisse. Last name is spelled P-as in Paul-L-E-I-S-S-E.

THE COURT: Thank you.

***DIRECT EXAMINATION***

BY MR. REISH:

Q. Mr. Pleisse, would you tell Judge Bloom what your present occupation is?

A. Well, I'm doing my best to be retired and unemployed. I was admitted to the Bar in 1972. And my last real job, if you want to call it that, was an Assistant States Attorney in Saint Mary's County, which began in 2011 and ended about two years ago when we lost the election.

And I now, I wouldn't say I work part-time, but I help support a good friend who is an attorney that has a very busy

practice, I help him with cases when I can. Sometimes, he refers busy-type cases to me. And I get oddball calls still from private clients. But I do not actually have an operating practice anymore. I'll be 83 in August, and I think it's time to maybe slow down.

Q. Thank you. Did you -- of the things you do, can you do those remotely, if you needed to, from where you live? And I'll ask you about where you live in a minute.

A. Yes. In fact, one of the assignments I do have, we have, in Maryland, a situation where our court commissioners do initial appearances and bond hearings. And there was a case about 15 years ago in our Court of Appeals that determined that these people were entitled to counsel. And the state public defender -- I'm trying to be tactful -- he declined to represent these people based on workload and so forth.

So, they created now, what is administered by the Maryland Court of Appeals, what's called an appointed attorney program. And that's where attorneys apply and qualify, which I have done. And then you are assigned four to six sessions a month, either 8 to 4, 4 to 12, or 12 to 8, depending on the jurisdiction. And I am qualified and do that. And that is all done remote. So, I do that from my desk at home with my computer, computer and phone.

Q. Okay.

A. In fact, I think I have four days scheduled the first two

weeks of June. So, they pay us an hourly rate for an eight-hour shift, and we're chained to our computer during that time. So, I do that on a regular basis, plus what I do with my good friend Dan Slade, who has a very active practice.
Q. Thank you. And you said you live, where is it that you live? Can you provide the Court with the address and then a description of the community?
A. Yes. The address is 1104, and then three words, Back Creek Loop. And that's located in a small community called Solomons, Maryland. Solomons, Maryland, is a little town at the very southern tip end of Calvert County, which is a long county that goes along the Chesapeake Bay. I practiced in Saint Mary's and also in Calvert; so, Southern Maryland, as we refer to the area.
Q. And at 1104, what type of residence is that?
A. That is a condominium. It's a two-bedroom condominium. It's in a building with, I think there are 18 units in the building.
Q. And of the units that -- I'm sorry, of the buildings in Solomons Landing, were there buildings that were built in the '80s and some that were built more recently?
A. Yes, sir. The building that I'm in and the first four buildings were built 25 years ago. The subsequent part of the development was about 15 or so years ago. So, the area I am in, which is kind of separated from the main area, there's two

buildings, both of which are 25 years old.
Q. Okay. Can you tell us a little bit about the other people in your building; their ages, whether they have small children of their own?
A. There is nobody yet that I have seen in my building with children. I see some come in and out to visit what, apparently, are grandparents. There's one lady that lives two doors down from me. She's a school teacher. She's retiring this year. She has grown children that live elsewhere. The couple that live immediately next to me, they have been there since the beginning, I think. And they do not have children. They are, I guess, in my age category.
Q. All right. How far away from the -- I'm assuming you drove here yesterday -- well, I know you drove here yesterday.
A. I drove here yesterday, yes.
Q. How long does it take to drive from Solomons up to Harrisburg?
A. It took about three and a half hours from Solomons, and I stayed at a hotel over in Camp Hill.
Q. Now, when you are in Solomons, do you attend any religious services in the community or in Saint Mary's?
A. Well, having lived and practiced primarily in Saint Mary's County all these years until I recently downsized to buy this condominium, and, in fact, the house that we lived in for, since 2014 -- or I lived in, is for sale, and that's in Saint

Mary's. I lived in Saint Mary's since -- oh, we spent some time in Florida, but I lived in Saint Mary's from the time I went there in 1973 and practiced law.

I'm a member of a church, which is located in a little crossroads community called Compton, which is near Leonardtown, which is the county seat. And that church is Saint Francis Xavier Catholic church. It is the oldest Catholic parish in the original 13 states. That's where Matthew was christened 36 years ago.

Q. And when you grocery shop, where would you grocery shop in the area?

A. Well, there's a grocery store within about a mile of my condo. And I've gone there a couple times, but I can't seem to find things that I like or need. So, when I go to mass over in Saint Mary's, I make a stop by a Food Lion, which is en route, or when I go over to Dan's office to help him out on a day, if I need to pick something up, I pick up stuff there at the Food Lion in Leonardtown.

Q. Thank you. And thank you for providing some information about your background, where you live, and what your daily activities are like.

I wanted to pivot to the third-party custodian and some issues that come up when someone agrees to be a third-party custodian. So, seated over there to your left is a U.S. Probation Officer.

A. Yes. I met him earlier, yes.
Q. Okay. And we have an Assistant U.S. Attorney here to my right. You probably met him?
A. I met him earlier also, yes.
Q. Now, you being someone who worked formerly with law enforcement, would you have any problems in telling somebody that is supervising your son, that your son has violated any of the bail conditions?
A. No. Matthew and I have probably one of the very closest relationships that a father and son could have. And he respects my career and my credentials. I have over 50 years of practice with a perfect reputation. And I don't think he would jeopardize that, and I wouldn't let him jeopardize it.
Q. And so, you would be willing to --
A. I'll pick the phone up immediately. And he would know that.
Q. And because he would know that, how do you think he would handle himself if you were a third-party custodian in his life choices and decisions?
A. I think all it would be, would be sort of a reminder, hey, this is not where we ought to be, and he would stop. There's no question in my mind.
Q. There have been some issues that were brought to the Court's attention, to my attention, to the U.S. Attorney's Office's attention, through something called a pretrial

services report. And one of the concerns is with mental health. In the past six months and a year, have you spent time with Matthew?

A. Yes. Matthew has come to visit me and help me with clearing out the house that we're selling. He's probably, since the first of the year, he's probably been down to see me at least three or four, if not five, times. He would usually come on a Thursday and go home Sunday. One time, he came and stayed a full week, seven days.

Q. And I'm gonna ask a question specific to any suicidal ideations or anything like that. Has Matthew expressed anything?

A. No. He and I -- obviously, with everything that's going on, there are some issues with his marriage and his family. And we have talked about that. We've talked about, you know, what he may have to deal with here coming forward. And there's no question in my mind that he's stable. He understands that he needs to get through this. And he's looking forward that once he gets through it, to starting a new life and probably a new career. Probably, being a police officer is not gonna work out. But he has a history from his military service and the transportation industry. In fact, he worked for a while with Snyder Trucking over here in Carlisle and also with Pepsi before he took the position as a police officer in the Borough of Shippensburg.

Q. And one of the other concerns is alcohol use; not just alcohol use, but excessive alcohol use. Could you tell the Court how you know anything about his alcohol use? When he visits you, do you go out to bars?
A. Yeah. When he visits, we often go out to dinner. And I'm, at this point, a two-beer guy. And he'll have a couple beers and maybe a few more when we get home. I have never seen him, regardless of any of that consumption, where he is either impaired or certainly not intoxicated and has always been in absolute control.
Q. Are you aware he is presently taking any medication?
A. To my knowledge, he's not taking any medication. When he visits me for three days, which is the usual visit, or the seven-day visit, which was a month or two ago, I never saw him whatever take any medication. If he was taking any medication or had any issues, I can't imagine he wouldn't have told me about it or discussed it. So, the answer is no.
Q. Thank you. I think you talked a little bit about your schedule. Is your schedule flexible enough that if you needed to be home or spend all your time with Matthew, could you do that?
A. That's where I am. The only other creature in the condo is Stella, who is a four-legged hound dog. And I spend my days there completely, unless I go out to run an errand.
Q. Okay. Thank you.

MR. REISH: Nothing further on direct, Your Honor.

THE COURT: Cross examination, Mr. Dukes.

MR. DUKES: Thank you, Your Honor.

***CROSS EXAMINATION***

BY MR. DUKES:

Q. Mr. Pleisse, good morning.

A. Good morning.

Q. So, you're working currently as an attorney. Right?

A. As little as possible.

Q. Okay. And so, what does your typical week look like?

A. Well, my friend Dan Slade, whose age is about 50, has a very busy busy practice. His father, who is my age, and I shared offices back in the '70s and '80s. He's a retired judge. So, I help Dan out because he's so busy. I go in maybe once or twice a week for an hour or two. He'll call me and say, hey, I got a case I need you to look at and, you know, just go over it with me, strategize. So, I do that. And occasionally, he'll have a lower-level case or a case that will be kind of involved. Primarily, the ones I've taken from him have been land, boundary disputes, trespassing, stuff like that. I've done a couple protective order cases that he's either referred simply because he's been too busy to do them or I've just gotten independent calls.

Q. Okay. Sir, the reason I'm asking is because I want to, basically, figure out if there is any other commitments that

you have that would take you away from your responsibilities as a third-party custodian?

A. No, not at all, no. In fact, I can, like, for example, the first two weeks of June, when I have to do the appointed attorney things, I'm chained to my computer all day. So -- and I would take more days if they would give you, but they just spread it out to make sure everybody gets a fair chance.

Q. Understood. And so, you have a computer in the house?

A. Oh, yes, yes.

Q. You have wi-fi?

A. I have wi-fi. I have internet. And when I moved to this condo, they tied my cellphone to Xfinity to this system, so that's where my phone is tied to right now.

Q. Okay. And there's other devices in the house? Like computers, tablets, those things?

A. I have a laptop and then I have my cellphone. That's it, yeah.

Q. Okay.

A. And a printer that doesn't work right now.

Q. Got it. They never seem to.

A. Yeah.

Q. And you've mentioned that you're close with your son?

A. Yes.

Q. And I think that you said something along the lines of, it's one of the closest relationships that a son and father can

have?
A. Yes. And the root of that is that my father and I, although he was a good father, he and I did not have a close relationship. So, I think my overreaction was being as best a father I could to Matthew. And I had a family before Matthew's family. In fact, I had custody of my two sons and raised them from age 4 or 5 until adulthood with those two sons, who are now, you know, adults; Charles is 59, John is 60.
So, I've been a father then, and then with the second family, with Matthew. And I took it upon myself to make sure I had the very best relationship possible.
Q. Understood. And you know Matthew's wife, Tyson. Correct?
A. I know her, yes.
Q. And you speak with her?
A. I speak with her when I go up there and visit. We don't have an ongoing dialogue relationship. But, you know, I'm there, we speak and have discourse, yes.
Q. And you have her phone number?
A. Yes, I do. It's in that sealed case right there.
Q. Oh, right, right. And you know that they have two grand -- or you have two grandchildren?
A. Yes.
Q. And those are your son's two --
A. My son and Tyson's two sons, Lincoln and Teddy; a presidential theme, I think.

Q. Understood. And you remember when HSI executed the search warrant on Matthew's home?
A. Yes.
Q. That was in April of 2025?
A. I forget the date, but it's been a year or so, yeah.
Q. Okay. And he told you about that?
A. Oh, yes, yes.
Q. He did. And --
A. He let me know right away, yeah.
Q. And he actually came to your home at that time, right after the --
A. I can't recall exactly, but I'm sure he did, yes. Yes.
Q. Okay. And he told you that they took his electronics?
A. Yes.
Q. And you've given him another computer, haven't you?
A. Not that I recall, unless it was something that was at the house at White Pointe Beach, which is the one I have for sale, unless it was something there. But I haven't had a tower for a long time. I can't remember ever giving him one. I may be mistaken, but I can't recall that, no.
Q. Okay. Would it surprise you if we came to know that he had a laptop that was given to him by you?
A. That could be possible, yes. The laptop that I have now, I think I've had for six or eight years. I just can't recall, I'm sorry.

Q. Okay. That's all right. Now, I don't ask these questions to pry, but would it surprise you to know that child pornography website titles were found on Matthew's cellphone dating back to early 2023? Would that surprise you?

MR. REISH: Objection. Can we have a timeframe, Your Honor? Just as far as, would it surprise him today? He knows he's been accused of child pornography. I just was trying to -- I don't want to -- this is kind of a compound question, the way it's been asked.

THE COURT: Yeah, if you could state the question again, Mr. Dukes? I'm not sure.

MR. DUKES: Yes, yes.

BY MR. DUKES:

Q. Would it surprise you, sir, to know that child pornography website titles were found in his browser history dating all the way back to early 2023?

THE COURT: Objection overruled. You can answer that question.

THE WITNESS: Yes, Your Honor. I understand from the search and seizure and the ultimate charges that have been placed against him, I understand what they are. I had no knowledge of anything about that prior to that. And my answer to the specific issue, would it surprise me, yes, it would surprise me. I couldn't imagine that Matthew would be doing anything like that.

BY MR. DUKES:

Q. In fact, he -- this was two years prior to the search warrant?

A. That's what the charges say, yes.

Q. Okay. And Matthew had told you about his addiction to child pornography?

MR. REISH: Objection, scope. We're here on a third-party custodian, and I don't want to get into a cross examination on the material of the case.

THE COURT: Yeah, I agree in that regard. However, I do think it's relevant to what he said in terms of the third-party custodian. And I'll give a little bit more latitude for the acceptability of the third-party custodian. So, the objection is overruled. You can answer that question.

THE WITNESS: Matthew's made me aware of what the charges are. And, as I said before, I was surprised about all of that, quite frankly. But he has told me the charges, and we have to deal with what he's facing. That's all I can say.

BY MR. DUKES:

Q. Sir, did he tell you that he had an addiction to child pornography?

A. *(Pause)* I can't specifically recall him saying that, no.

Q. Let me rephrase the question.

A. Yeah. We had some discussions. And, apparently, there was a situation when he was a very young child that may have

caused him to have these type of interests, abuse by a third party. And his mother and I were never ever aware of that.

So, again, all of this, there's just this big vacant time from the time he was a small child until this all occurred. And we've had discussions. And I can't think he's told me or used the term addiction. Apparently, there's some magnet that drew him to this, an unexplainable --

Q. But he told you that he views child pornography?

A. *(Pause)* If I may, Your Honor, object to that question? He's asking me to incriminate my son. I don't think that's appropriate.

THE COURT: Well, you don't have that ability to object to a question as a witness. And there wouldn't be a privilege as a third-party custodian.

THE WITNESS: I understand that.

THE COURT: I do understand your concern, nonetheless. But I will direct you to answer that question.

THE WITNESS: Okay, thank you. He's told me he participated in this and that he was attracted to it going clear back to when he was a small child and was abused.

BY MR. DUKES:

Q. Talking specifically about child pornography. Right?

A. Yes.

Q. Are you aware about the -- you're aware of the Child Youth Services investigation involving his children just last month?

A. Yes.
Q. Right? And he told you about that?
A. Yes.
Q. And that CYS, or Child and Youth Services, received a ChildLine report. Right?
A. I do not know about that. Apparently, little Lincoln, who, I think, is in kindergarten, allegedly touched another child. I don't know whether it was a male or female. And that's what led to the investigation. Whether there were reports, I am not aware of all of that.
Q. Okay. Did he tell you that they wanted to interview him?
A. I think he was interviewed, yes.
Q. And so was Tyson. Right?
A. Yes. I think they made several home visits.
Q. Right, okay. CYS. Right? They went and did the home visits?
A. Yes.
Q. Right. Did he tell you that --
A. It's my understanding that, that case was closed without any incident and it was resolved with no findings whatsoever.
Q. That is my understanding as well, sir, that CYS did close their case on that. But, specifically, did he tell you that he wanted Tyson not to mention anything about his child pornography habits or addiction?
A. I never heard that, no.

Q. Okay. So, it would surprise you to know or hear that he told her to lie to CYS?
A. I'm not familiar with that at all.
Q. Okay. All right. We had talked a little bit about what Tyson had said to probation. I am just kind of shifting topics back to what we talked about --
A. Are you talking about this probation here?
Q. Yes, correct, yes. Yes, sir. There were things that, I believe, you said were incorrect. Is that your recollection?
A. Yes.
Q. Okay. Did you make any attempts to reach out to Tyson about these statements?
A. I did not. Matthew's mother, who lives in West Virginia, a couple hours from Shippensburg, she and I have been divorced since late 2008, 9. And she has her life and I have mine. But we are very unified when it comes to anything involving our two sons, Matthew and his half-brother Nicholas. So, we spoke three or four times over the last several days. And it was she that took the lead to discuss these erroneous issues with Tyson. I did not speak to Tyson directly.
Q. You did not?
A. I did not, no.
Q. Did you leave her a voicemail?
A. I left her a voicemail yesterday afternoon to encourage her to call probation and correct the discrepancies which

Matthew's mother had discussed with her. And Matthew's mother, I'm going into hearsay now, but Matthew's mother said Tyson acknowledged those errors and would call probation to make those corrections. I was not directly involved in those conversations. And as far as my voicemail, I left her a voicemail yesterday to remind her to do that prior to this hearing.

Q. Sure.

A. She didn't answer. I left a message.

Q. Got it. And you've spoken with Matthew recently over the phone?

A. I've spoken a couple times on the phone. Our basic conversation has been me to try to give him strength to get through this, and that when he comes out on the other end at sometime, someplace, he will have a better life, better career, and he will be able to build a relationship with his two sons that he loves dearly. And I, you know, go back to telling him, you know, whether you have custody or don't have custody, that doesn't keep you from having a close relationship with your children.

Q. Understood.

A. Those are the type of conversations.

Q. And you're aware that those conversations were recorded. Right?

A. Yes. Yeah, there's an announcement when he calls, yeah.

Q. All right.

MR. DUKES: No further questions, Your Honor.

THE COURT: Any redirect examination?

MR. REISH: There was one issue I missed as to the third-party custodian.

***REDIRECT EXAMINATION***

BY MR. REISH:

Q. As somebody who, I believe, owns firearms, would you make sure there's no firearms in the condominium?

A. Yes. I have a locked gun case in my condo which has two or three shotguns and a .22. There's one .410 that my grandmother Stella used to shoot rats with, I think. And I can have that removed immediately, yeah.

Q. Thank you.

THE COURT: Just briefly. Sir, you indicated that you use the wi-fi at your home and you also have a laptop and a cellphone. Would you be willing to remove the computer and also the wi-fi from the home?

THE WITNESS: (Pause) Well, that would be difficult because of my ties to the court system, number one, with the attorneys thing. And what business I do conduct, I conduct with the laptop. But if that were necessary, I could do that, yes.

THE COURT: All right, very well. Any further questions based upon that?

MR. REISH: Based upon that, Your Honor.

***REDIRECT EXAMINATION***

BY MR. REISH:

Q. Just, is the computer passcode protected? Is the network passcode protected?

A. Yes.

Q. Yes and yes?

A. Yes. Only I know the password.

MR. REISH: To the extent it makes a difference, Your Honor, we wanted to complete the record with that.

THE COURT: I appreciate that. Mr. Dukes, any additional questions based on that?

MR. DUKES: No, thank you, Judge.

THE COURT: Sir, you may step down. Thank you.

THE WITNESS: Thank you.

THE COURT: And, Mr. Reish, any additional witnesses?

MR. REISH: No additional witnesses, Your Honor.

THE COURT: All right. Then you may proceed with your presentation.

MR. REISH: Thanks. So, Your Honor, in this matter -- and I know Your Honor's familiar with a lot of the standards I'll go through here, but just so that my client and his father are as well. You know, we have a former law enforcement and eight-year military reservist, who is in the Army Reserves, and as an officer in both Saint Mary's County,

Maryland, and, later, in Shippensburg, with no criminal history and supportive parents. We have someone who's not a danger and someone who can be trusted to return to court.

We do know that there is, as Your Honor said, a presumption in this case. But it can be overcome by some credible evidence. And the burden on this offense is for production only and the burden of persuasion remains with the government the entire time. And if it's rebutted, the presumption is just one of many factors to be considered by the Court, as Your Honor knows.

And this is the home that John lives in. This is -- as you can see, there's Units 1101 through 1136. And if you look straight back down that pathway, you'd look towards his unit. And this is in a community. And the part of this community, Back Creek Loop is on the upper portion there. So, you can see where it is within this community. You've heard a description of the neighbors.

And Matthew's willingness to be there during any non-working hours is some credible evidence that can overcome the presumption. If Your Honor wanted to use location monitoring, again, this is some credible evidence that can overcome the presumption. Courts have found in *U.S. v. O'Brien* was one example. I know the courts used that before, that case name.

And, as well, we have a third-party custodian here.

And the third-party custodian is a practicing attorney, former state attorney in Maryland, a prosecutor.

Now, to overcome the presumption, we have the family ties to Maryland. So, he has his father there. He also grew -- after he graduated college -- he grew up in Florida, but after he graduated college, he lived in Maryland with his father for a period of time. He was a law enforcement officer there. He was married down there. So, he has ties to the community as well as family ties to that community.

He had a work history; it's noted in the pretrial services report, law enforcement, as well as, his dad did mention, transportation as well. His willingness to stay at home, we mentioned, be subject to electronic monitoring, and a third-party custodian. So, we believe that the presumption has been rebutted.

And then the burden returns to the government to show by clear and convincing evidence that he's a danger to the community and/or by a preponderance of the evidence that he's a risk of flight.

So, in trying to resolve this, Your Honor has a lot of tools. And we have the third-party custodian we proposed. You could order that he maintain employment. Now, he's on administrative leave presently; if that ends, he must seek employment. If he's gonna leave the condo, there might be a condition you could impose. I think he already has a

Bachelor's degree; I don't think pursuing education would be necessary here. He has some trade skills as well. But Your Honor could use that as well in your tool kit as well as restricting associations and/or travel.

There's really -- it's standard to avoid contact with any witnesses, to the extent there are any. The reporting to law enforcement, pretrial services, he could comply with a curfew would be standard, refrain from possessing firearms or any other weapons, and refrain from excessive use of alcohol or any other drug.

And if there are concerns about his psychological or substance abuse, you can order an evaluation and order that he comply with any course of treatment, Your Honor. I don't believe money is an issue, bail bond, or not returning to custody for any other purposes. So, you should be reasonably assured and the community can be safe by these reasonably assured conditions.

And we'll go through the bail factors. When you're weighing all this, Your Honor, if you look at the nature and circumstances of this offense, it's not a contact offense, at least as I understand it. And I don't have any reports; I asked for reports. But if I'm wrong, Attorney Dukes will correct me. But, right now, I don't believe it's a contact offense.

And he has not fled despite knowing this is something

that's been pending for a year. As you can see in the pretrial services report, he has had his passport this whole time. And he's lived with his wife and two children in Shippensburg. And in cross examination, you heard that there was even a government agency in charge of protecting children, and that how it found that it was an investigation that didn't require further investigation, or unfounded, it sounds like, or a resolved investigation.

The weight of the evidence in this case -- and, Your Honor, I've been clarifying the weight of the evidence issues. The weight of the evidence in cases means the weight of the evidence about his dangerousness. The presumption of innocence in a case, the presumption of innocence applies throughout this entire hearing. So, if we're gonna look at the weight of the evidence, it's what evidence we have that is speaking to his dangerousness.

This is not a violent offense. I've given the Court two cites here. And it makes sense, if you think about it. How are you supposed to afford him the presumption of innocence and still figure in the weight of the evidence? Well, you have to look at what type of evidence it is.

So, in a case where you have a violent offense, I think Your Honor's able to look at the weight of the evidence as to that violent offense. Again, there's no contact here. It's a receipt, attempted receipt and possession case. So, it

doesn't speak to either dangerousness or flight in this case. And the case law speaks clearly that this is the least heavy of the factors the Court would consider.

His personal character is like something that you don't see. I mean, I represented correctional officers in very similar cases that have served in county facilities and in federal facilities, you know, but it's often not the case that this is who Your Honor sees. But this is somebody who is former law enforcement, he's Army reserves.

To the extent that when that happens, people in positions of power within the law enforcement community are upset by that, it's understandable. It's somebody that they feel let that community down. But that is not what we're here for with the Bail Reform Act.

We're supposed to look at their character. And looking back at his character, he has a good character. And he has no criminal history, as noted in the pretrial services report. He did not attempt to flee.

We are requesting a correction that there wasn't a diagnosis and he's not presently taking any prescription medication. The testimony that you heard from a witness under oath confirmed that. I know the government's proffered something different through a pretrial services report by an officer, and I don't know if it was Officer Karhnak or an officer who's not present, I'm not sure who interviewed her, if

they want to clarify that any further. And if you have concerns, use your tool kit and ask for a psychological evaluation and complying with any treatment and/or medications.

The family ties, his relationship with his wife is deteriorated. We're not asking him to be released to his wife and his children, but he does have two small children. And that's a reason to stay in the area when it comes to flight. So, he also wishes to continue to support them with his administrative leave pay. He wouldn't be needing to pay to stay with his father. The family could still receive the benefit of having his pay.

THE COURT: Mr. Reish, if I may just ask you one question?

MR. REISH: Sure.

THE COURT: You raised something I just want to follow up briefly. The pretrial services report indicates on page 2 -- actually, page 3 of that document --

MR. REISH: Yeah.

THE COURT: -- and it's gonna be the mental health and substance abuse. At the end of that second paragraph, it says, Defendant meets with a therapist once a week and he is prescribed mental health medications. That's what you're indicating that, that's incorrect?

MR. REISH: The meets with the therapist is correct, not that he has medications.

THE COURT: No medications.

MR. REISH: Yeah, he has no medications. Your Honor, when this originally, back a year ago, for a month, he was having difficulty sleeping and he had to take some medications at that point. And it's possible, because his relationship with his wife, I mean, they're roommates more than married, that she may have understood that he continued to take it.

He's been with his father. His father doesn't see him take medication. I would proffer that he doesn't take any medication --

THE COURT: Understood.

MR. REISH: -- presently. The other community ties, I already highlighted, which is down in Maryland, with his father being also plugged into that community. He practiced law -- he's practiced law for 40 years, although about 15 of those were in Florida in a title company. And Matthew lived down in Florida during that period. He attended college down there. He spent a lot of his youth down there as well.

Employment, he is on administrative leave. He receives pay, but it's not significant enough to be a flight risk. He's lived in the Middle District for about nine years. Lived in Maryland prior. And, again, as you heard, he lives here presently. He has community ties in both Maryland and the Middle District.

He is law-abiding, member of law enforcement, and

served in the military. There was excessive drinking reported by his wife. His father admits that they would go out and drink socially. You can impose conditions that either restrict drinking or say he does not drink to excess. When he's been around his father, who we're asking that he be around, he's not drinking to excess. And that was, again, just going back to that report that he was drinking excessively on weekends from his wife. And I, again, would offer him to undergo a drug and alcohol evaluation if you have any concerns, Your Honor.

There's no criminal history, no nonappearance, so the Court can be reasonably assured by requiring him to remain in Maryland at his home and subject him to electronic monitoring, requiring him to surrender a passport, the third-party custodian, if needed, and impose any travel restrictions. He's not a danger. No firearms. You can have firearms removed from the home. And the same as the prior slide, Your Honor.

So, the pretrial risk assessment, as I've done it -- and I just ask, I don't know if -- I think we're a category one? We are. So, we would be in a category one in this, Your Honor. And so, in a category one, Your Honor's familiar with PTRA, I worked this through. Can you see that, Dan?

Some of these -- the one I wasn't sure about is the current offense type because I was using a 2013 grade scale. But either way, he's still either, like, a two or a three. So, his total score, Your Honor, would be a one or zero to four.

And Your Honor's familiar with the study that was re-evaluating the effectiveness of this tool, this tool the Court has.

And so, in this case, at a one, arrest for violent offenses, is .3. Failure to appear is .7. And we think that, that fits into his odds of success. When it comes to the government carrying its burden of proving flight, it cuts against the government both to flight and, as you can see, to the danger to the community even more so, it's a .3.

So, I'm just gonna go through these quick and speak to them. In the end, there's a situation -- I understand, just a general standpoint, that when someone is in law enforcement, people get upset, right, because it's who we don't expect this to happen to. It does happen sometimes. That can figure into the Court's analysis.

But I also ask the Court to figure in all the good service to the community. He's got a solid family structure. If released, if there's worries about mental health, a better place for mental health is going to be in the community, not in jail. Same with substance abuse.

And if this case resolves in a down the road sentence with some mitigation arguments, the BOP is in a much better position to house somebody that is a member of former law enforcement than county facilities. And the correctional officers that I represented in the past that were released pending pretrial with conditions, one of them, I know, went to

Georgia to such a facility. It is a safer place for people in the community to keep him out of county jails right now both for himself and to the people in those jails, I would think, too. We don't need to do that here.

We have many other ways to keep him out with all the tools at Your Honor's disposal. We'd ask that you please do that pending the outcome of this case. Don't pre-judge where the case goes. But, thank you, Your Honor.

THE COURT: Thank you. Mr. Dukes?

MR. DUKES: Yes, Your Honor. Just at the outset, the pretrial risk assessment scoring guide, as the Court is aware, is not a part of the 3142(g) factors for consideration.

But in analyzing the 3142(g) factors, nature and circumstances of the offense charged, this is a child exploitation offense, bottom line. These are attempted receipts and receipt and possession. To the government's understanding, there has not been a hands-on offense. But what we do have is a complicated scheme of actually acquiring the child pornography.

This is involving the dark net, the Tor browsers, cryptocurrencies, different types of dynamic static IP addresses. Your Honor, all of this is designed specifically to obfuscate his movements, to conceal all of the evidence. And that's the nature and circumstances that we're looking at for these offenses.

Now, when it comes to the weight of the evidence, the case is strong, Your Honor. By way of proffer, this is about buying child pornography, it's not just receiving. There is an exchange of money for child exploitation material, pictures, videos. And the exchange of money, it's a multi-step process that the defendant went through.

You can see the currency from his Shippensburg Borough deposit into his M&T Bank account that is listed exclusively to Mr. Pleisse; from there to a Coinbase account, and that Coinbase account, which has Know Your Customer laws, has all of his information, including the front and back of his driver's license, and a selfie that was taken in his kitchen; from that Coinbase account, it goes to a non-custodial wallet, and that non-custodial wallet is exclusively funded by Mr. Pleisse; from that non-custodial wallet, the Bitcoin, the cryptocurrency, and it's a little bit more nuanced, there's a little bit more technicalities to it, but that cryptocurrency then goes to another wallet that is directly attributed to dark net CSAM websites.

And without getting bogged down in the weeds of that, there was also child pornography that was just found on his computer in his home in his tower, the tower computer that was at his desk. And those were two images - one, depicting a minor male with his penis in an adult female's mouth; and the other, a prepubescent female with a penis near her mouth. File

names - the file path was under users/Matthew. And these were cached images. And the title or the file name, black pedo mom passion sucks black boy hardcore pedophilia. And there's other similar names that were also found.

So, the cryptocurrency and the dark net, there's a little bit of complication with that, there's a little more intricate, but, at the end of the day, these are dark net websites that the agent has actually been on, has actually reviewed and seen images that were on the websites, the titles of the websites such as molly porn, pedo play, and one little babies real child pornography -- excuse me, little babies real child porn. So, there's no ambiguity about the weight of the evidence in this case. The government offers that it is strong and it's corroborated.

On his phone, there was the seed phrase to the non-custodial wallet that conducted these transactions giving him access to that wallet. That was in his notes. And the metadata from that note when it was created married up exactly with the beginning of the transactions.

And this is an ongoing transaction. You heard that, it was offered on cross examination, going all the way back to 2023, Your Honor. This is a problem, and there isn't a means that we are able to -- there is no condition that would be able to adequately address that.

And when we're looking to the history and

characteristics of the person, Your Honor, this is an officer -- was an officer in the Army and a detective. He's intelligent. And that is apparent by the evidence. The means that he used to obfuscate and to conceal his movements were technically sound.

But when we look to the character, we look at Count 1, which is the attempted receipt. And the date on that, July 8th, that was a transaction where you can see that flow of money from his M&T Bank account to Coinbase, Coinbase to non-custodial wallet, non-custodial wallet to another wallet that is directly attributed to molly porn. And that starts around 7:30 in the morning.

We know from his work schedule, just a day prior, July 7th, that he was working from 06 to 1500 with one hour of overtime. He wrote a report that was created at 11:45 that was detailing his review of an eight-year-old's interview where that eight-year-old reported that she was raped. Less than 24 hours after he writes this report, having reviewed the interview, this is what he's doing. He's transacting with the dark net website that is purchasing child sexual abuse material.

And, Your Honor, the government submits that, that speaks to the character of the accused as well as the nature and circumstances of the offense.

And he does not have a criminal history, admittedly.

But when we look at these 3142(g) factors, there are no conditions that can adequately address the concern that the government has for the safety of the community given the nature of these offenses and, especially, in light he was just arrested and his cellphone was seized.

By way of proffer, on the locked screen of his cellphone was a notice or a notification from what appeared to be Chat GPT. And on it, said, Make a Mini Me Scene. Turn one photo into tiny versions of you doing cute little things.

And so, the government respectfully offers that the danger he poses to continue his offense is palpable and there is no set of conditions.

Further, the third-party custodian, Mr. Pleisse, while the government offers that his intentions, we're not questioning; however, we do not believe he is a suitable third-party custodian. He has mentioned that he has an extremely close relationship with his son, and we do not believe that he is qualified to be the eyes and ears of the Court.

We do not believe that they have presented any evidence -- or excuse me, sufficient evidence to rebut the presumption. But even if they did, Your Honor, the government submits that the 3142(g) factors weigh heavily in favor of continued detention. Thank you.

THE COURT: Mr. Dukes, you had mentioned during

questioning, there was indication that the defendant's father may have provided a computer to him. Could you speak to that and when that may have occurred?

MR. DUKES: Yes, Your Honor. So -- and thank you for bringing this up, because this is also an additional concern that the government does have. There was a CYS investigation that had occurred. And in that investigation, it was brought to law enforcement's attention that the defendant had told Tyson Pleisse to lie to CYS. That information was presented.

And in the course of that, it was also relayed that he, the defendant, had received a computer, a laptop from his father; unsure of when, but it would have been after the search warrant had been executed and, arguably, after Mr. Pleisse, the third-party custodian, had known that he had an addiction to child pornography.

THE COURT: All right. And, Mr. Dukes, in terms of the inventory from the search warrant, was -- I take that back. I'm happy to hear any additional argument from defense counsel, Mr. Reish, as it relates to this issue.

MR. REISH: Sure. Regarding any type of electronic equipment, the Court can ask that he does not have any, he does not have access to any, if that is a concern from the government, or that it has monitoring on it, just a simple phone with just simple things on it. There's ways they can take care of those concerns and comply with those conditions.

THE COURT: All right, thank you. I'm going to take this under advisement. We'll adjourn back at 11:30.

COURTROOM DEPUTY: Court is in recess.

*(Recess was taken.)*

THE COURT: Mr. Pleisse, you come before this Court, as I indicated, based upon the government's request for detention. I'll note that, first, in considering this request, I'm guided by a number of things.

First, you're entitled to a presumption of innocence throughout these proceedings, and that's absolutely one of the things that you're guaranteed. And I'll talk about the weight of the evidence argument that your counsel made in a moment. But I just want to indicate to you that, that continues throughout these proceedings.

The second thing is, under the Bail Reform Act, detention is an exceptional step. And that means that, generally, I shall release someone unless there's a danger to the community and a flight risk. And in looking at those, I have to consider a number of factors.

There's -- first, this is a presumption case. And based upon the presumption that's applied, the indictment is sufficient to carry that initial presumption. But I want to say, first, that your attorney has presented evidence that would rebut that presumption, and that being a third-party custodian and also the possibility of electronic monitoring.

However, that's just one factor that this Court is required to consider.

What I also must consider are the requirements in Section 3142(g). And 3142(g) provides specific factors that this Court is required to consider. And those factors being, first, the nature and circumstances of the alleged offense. And when I look at that, I find that, that factor weighs in favor of detention.

I would note that this is, based upon the allegations that are contained in the indictment, this is a quite serious offense. In fact, it's so serious that Congress deemed that this offense should carry mandatory minimum sentences. And on that basis, I find this factor weighs in favor.

I would also note that, based upon the indictment and the information that's contained therein, the offenses continued for a protracted period of time, at least beginning as early as, I believe, September of 2024 and into April 29th of 2025. I would, do credit, not that I would, I do credit your attorney's argument that this offense is not a contact offense, meaning, you have not committed a contact offense. However, I must point out also that the underlying, based upon the information that was provided to the Court by the United States, the underlying offenses were contact offenses. And without individuals who receive or purchase, as in this case, that material, that would not otherwise exist.

The next factor that the Court is required to consider is the weight of the evidence. And the statute indicates simply that, the weight of the evidence against the defendant. And your attorney has argued that, that weight really relates to the dangerousness and the risk of flight. I think he's correct. But I don't think it stops there. I think that it actually goes both ways. And I was able to find some law.

Essentially, Section 18, United States Code, Section 3142(g)(2), instructs the Court to consider the weight of the evidence when making a pretrial detention determination. It is clearly the case that evidence of the underlying offense charged and evidence that goes to flight risk or danger to the community are relevant to the issue of pretrial detention. However, the canons of statutory interpretation, as well as precedent from this and other circuits, strongly indicate that the primary consideration invoked by this section is the evidence of the underlying offense charged. The Court, therefore, concludes that 18, United States Code, Section 3142(g)(2), primarily references the weight of the evidence of the underlying offense in this case, which is strong.

I would also note that of the charges here, in terms of weight, they're entitled to presumption that, I guess, in some respects, because we have mandatory minimums, that provides also, that provides a greater risk that someone may

flee.

I would note that the next factors that the Court must consider are the history and characteristics of the defendant. Your attorney has argued that you're not a flight risk, as evidenced by the fact that you have not fled in a year. And I think that is significant. And I think that's a well-invoked argument and was properly made by counsel.

When I look to the other factors -- and that's just one of the factors. That's significant, but it's just one of the factors. I look to your physical condition. You're of good health. I think that goes both ways.

And I think that the next is the mental condition. I will note that the pretrial services report indicates that you're seeing a therapist one time a month. The Court's concern is that therapy for one time a month for someone who's not working and who has a lifetime addiction, as indicated, is simply insufficient.

The next, the fact that there's no prior criminal history. I would note that while there is no prior criminal history, and that is a factor that does weigh in favor of the defendant, the conduct also dates back, based upon the proffer of the United States, to 2022. In the first seven counts, as I indicated, indicate conduct between at least July of 2024 and January of 2025, evidencing you simply were just not caught engaged in this activity and that's why there's been no prior

arrests or conviction.

I would also note in terms of the history and characteristics of the defendant, the proffer presented by the United States indicates that the defendant told his spouse, Tyson, to lie regarding information to CYS.

There's also an indication from the defendant's spouse that he drinks excessively on weekends. I will not give this any weight because I don't know what that would be based upon. Excessively could, to some people, may be 4 drinks or it may be 10 or 20 drinks. So, I do not give that weight.

What I do give weight is that there was a proffer that the defendant was engaged in an interview of a child following a rape and, following that interview, on July 8, 2024, the defendant engaged in the attempted receipt of child pornography, as indicated in Count 1 of the indictment. I think this is probably one of the greatest abuses of trust and, clearly, indicates a sexual gratification.

I would also note that, as it relates to the defendant, the defendant was a detective in the Shippensburg Borough Police Department engaged in the prosecution or, I should say, the investigation and ultimately prosecution of child exploitation offenses; therefore, he has the ability and is better able to evade detection and destroy evidence.

I would also note another factor is the defendant is facing a catastrophic personal and professional consequence and

has a stronger motivation to abscond. It's extremely likely that he will also lose his career as a police officer if ultimately convicted.

Defendant presented a study from 2018 indicating that individuals in a category one have a .07 likelihood of failure to appear. However, this Court is well aware that of offenses individuals are charged with, that child exploitation offenses have the highest rate of suicide and, among those and that highest rate of suicide, individuals who are in a law enforcement role, the risk of suicide is even greater.

Defendant has also proffered that the defendant would be safer out of county jail. I cannot disagree with that. However, that's not one of the factors that this Court is required to consider in 3142(g). Nonetheless, I have given that some weight in my assessment of this matter.

When I look to the next offense, which is the nature and seriousness of the danger to others or the community, I find that the risk is great. I find that the nature and seriousness of this offense is the exploitation of this country's and this community's most precious resource, which is children. When I look to all those factors, they weigh in favor of detention.

The defendant next presented a third-party custodian, and I want to speak to that. However, I just want to note before I do speak to the issue regarding the third-party

custodian, I do commend both counsel for their very well-argued positions. This decision was difficult to make.

When it relates to the third-party custodian, the third-party custodian, who has been an attorney for over 50 years and an individual that's been successful in the community, he indicated that he's extremely close with his son, and I commend that. However, this is something that his son did not share with him prior to his arrest or prior to the search warrant that was executed. There's also concern regarding a laptop that may have been provided to his son following this search warrant. The Court finds it difficult to believe that the proposed third-party custodian would not remember providing a laptop to his son. Nonetheless, I am going to credit that testimony. I would note further --

MR. REISH: Your Honor?

THE COURT: Yes?

MR. REISH: With regard to the laptop, when we left the courtroom, I spoke with John Pleisse. And there was a laptop, maybe he didn't recall on the stand, but it was, like, a door prize, like, a small device. And he recalls his son getting it. And before Your Honor goes further, I just wanted to make sure that, that is the information you relied on.

THE COURT: I appreciate that, and I didn't know that. And I was actually, to be honest with you, I found Mr. Pleisse, John Pleisse, I found him to be generally credible.

And while I found -- I appreciate that, providing that additional information.

The Court's concern is also in the following. There is wi-fi in the townhouse. And while his father indicated that he would be willing to turn off the wi-fi in the townhouse if he was permitted to be a third-party custodian, the Court's concern is that the defendant would be able to piggyback wi-fi connections in such a tight community, and I can't order others to turn off their wireless connections.

It does appear also from the map that was provided, that this is a fairly large, tight community. From the picture, there are at least 36 units. And there's many other units surrounding that area. And the Court has significant concerns to the access of children.

I would note that the defendant is computer savvy. He was a detective charged with a responsibility of investigating child exploitation crimes. He engaged, as alleged, in a complicated scheme to purchase child pornography. I would note that someone experienced in cyber or child exploitation investigations also knows how to engage in such conduct, how to encrypt such conduct, how to wipe, hide, and transfer files.

I would also note that any individual that's engaged in child exploitation cases has technical skills themselves, which should be treated as a public safety concern because it

may facilitate offending or evidence destruction.

I would also note that the Court's concern is that the conduct may continue if the defendant is released. And, again, as I indicated, the defendant's duties, background indicate that he is a risk of harm to minors. He misused his authority. He has insider knowledge. There's certainly going to be a great issue, perhaps, if convicted regarding the compromising of all of the cases that he engaged in and their investigations.

I will note that this Court has not considered the ChildLine report regarding the defendant's five-year-old son, as it's my understanding that these charges were dismissed.

However, given the totality of all the information, and considering the pretrial services report and the recommendation in the pretrial services report, an indication that, based upon their information, they recommend that no condition or combination of conditions would reasonably assure the appearance of the defendant as required and the safety of the community, on all those factors, and considering the factors that I must in Section 3142, I am going to order that the defendant be detained pending trial. And the Court will prepare an order of detention in that regard.

I would request that the Marshal Service, wherever they send the defendant, I believe it's probably, I'm sure they dealt with this issue before, but I would ask that they address

the issue, the fact that he's been a police officer, and that he not go to a facility where that may become the knowledge of other individuals, or that he be protected in some way as best as the local facility is able to do so.

That's the Court's order. And, Mr. Dukes, is there anything further this Court needs to address on behalf of the United States?

MR. DUKES: Your Honor, the government would simply request that the defendant have no contact with Tyson Pleisse other than what is necessary for housekeeping or childcare matters, Your Honor.

THE COURT: I believe, as my order -- and I'm not sure in terms of -- well, let me hear from Mr. Reish in that regard and I'll address it. Mr. Reish?

MR. REISH: I mean, to the extent that she would have been some type of a witness, carving out an exception for necessary contact with children seems appropriate, if that's what Mr. Dukes is proposing.

THE COURT: Yeah, I guess my --

MR. REISH: I don't know.

THE COURT: From the Court's, from my review, I would indicate, as an individual that's gonna be incarcerated or at least held or detained prior to trial in this matter, that he will have access only to a telephone from the facility, and that would be communicated. But I would otherwise -- I don't

know that I -- otherwise, if it becomes an issue, but it wouldn't be this Court's intent to instruct him not to contact his spouse. I think the spouse can simply not pick up the telephone if that becomes an issue.

MR. DUKES: Understood, Your Honor.

MR. REISH: Thanks, Your Honor.

THE COURT: Is there anything further, Mr. Reish, on behalf of the defendant?

MR. REISH: No, Your Honor.

THE COURT: All right. Thank you, gentlemen.

COURTROOM DEPUTY: Court is adjourned.

*(Digital recording ends.)*

*CERTIFICATION*

*I, Wendy C. Yinger, Federal Official Realtime Court Reporter, in and for the United States District Court for the Middle District of Pennsylvania, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript to the best of my ability of the digitally-recorded proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.*

*/s/ Wendy C. Yinger*
*Wendy C. Yinger, RMR, CRR*
*U.S. Official Court Reporter*
*Wendy_Yinger@pamd.uscourts.gov*

*(The foregoing of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)*